## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 16 2018, 9:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott L. Barnhart
Brooke Smith
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gregory Bruce Grider, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 16, 2018 <br><br> Court of Appeals Case No. <br> 18A05-1706-CR-1484 <br><br> Appeal from the Delaware Circuit Court <br><br> The Honorable Marianne L. Vorhees, Judge <br><br> Trial Court Cause No. <br> 18C01-1607-F1-5 |

**Pyle, Judge.**

# Statement of the Case

Gregory B. Grider, Jr. ("Grider") appeals his convictions and sentences for two counts of Level 1 felony attempted murder.[1] On appeal, he argues that: (1) the State presented insufficient evidence to support his convictions; and (2) his sentence was inappropriate in light of the nature of his offense and his character. Because we conclude that there was sufficient evidence to support Grider's convictions and his sentence was not inappropriate, we affirm the trial court's decision.

We affirm.

# Issues

1. Whether there was sufficient evidence to convict Grider of attempted murder.
2. Whether Grider's sentence was inappropriate.

# Facts

On May 27, 2016, the Delaware County Sheriff's Office received a 911 call reporting that a woman, Jennifer Bradford ("Bradford"), was being held hostage at gunpoint by her boyfriend, Grider. Dispatch warned the officers that Grider had three active felony arrest warrants and had previously threatened to "have a shootout with the police." (Tr. Vol. 2 at 185). Several officers

---

[1] IND. CODE §§ 35-42-1-1(1) and 35-41-5-1.

convened to determine how to approach the situation and then proceeded to the reported address to do a welfare check on Bradford.

[4] At the residence, Corporal David Lee Williams ("Corporal Williams") and Deputy Anthony Johnson ("Deputy Johnson") approached the front door while other officers took up posts around the home. As Corporal Williams and Deputy Johnson stepped onto the porch, a motion sensor caused a "chime" to "go off." (Tr. Vol. 2 at 228). Deputy Johnson, who knew Grider, looked into a window and identified Grider sitting next to a woman on a couch. He told Corporal Williams that he could see Grider and then knocked on the door and announced, "Sheriff's Office." (Tr. Vol. 2 at 228). In response, Grider and the woman stood up and walked toward the back of the home.

[5] Deputy Johnson then tested the door handle, discovered that it was unlocked, and turned to relay that information to Corporal Williams. When he turned back around, Grider had returned. However, Grider did not answer the door. He started to step backwards, so Deputy Johnson knocked on the door and announced his presence again, this time "a lot more forcefully." (Tr. Vol. 2 at 234). When Grider did not respond, the officers entered the home and yelled at him to show his hands. Grider stepped backwards and refused to comply. Instead, he "blad[ed]" his body so that his head was facing towards the officers and his body was turned away from them. (Tr. Vol. 3 at 74). At that point, Deputy Johnson heard a "distinct pop" that sounded "like a firecracker" and smelled gunpowder. (Tr. Vol. 2 at 244). Corporal Williams saw a muzzle flash

and heard a "firecracker."[2] (Tr. Vol. 3 at 75). He also saw Grider holding a gun and pointing it in the officers' direction. There was then a "second pop," and Deputy Johnson saw a muzzle flash from the area of Grider's waistline. (Tr. Vol. 2 at 246). The muzzle flash was pointed in the officers' direction.

[6] After the second shot, Deputy Johnson shot Grider, and Grider fell to the floor. As Grider was lying on his left side, he continued to "actively fish[] or search[]" down by him stomach area with his left hand. (Tr. Vol. 2 at 249). Because Deputy Johnson believed that Grider was continuing to look for his gun, he then shot him a second time. At that point, Grider started yelling "I'm done. I'm done. I'm done," and the officers were able to take him into custody. (Tr. Vol. 2 at 249). As they did so, Grider yelled "kill me," "shoot me in the head," and "I wish I was trying to go for my .45." (Tr. Vol. 3 at 32, 87). The officers found Grider's gun in the place where he had been lying.

[7] On July 19, 2016, the State charged Grider with two counts of Level 1 felony attempted murder. At Grider's jury trial, Corporal Williams, Deputy Johnson, and the other officers who had been at the scene testified to the above facts. Corporal Williams was asked whether he was "absolutely positive [Grider] [had been] firing at [him] and [Deputy] Johnson," and Corporal Williams responded "Yes." (Tr. Vol. 3 at 94).

---

[2] According to Deputy Johnson, a muzzle flash is a "flash of light" that occurs when a firearm is fired and the powder burns. (Tr. Vol. 2 at 246).

[8] In addition, Jennifer Davis ("Davis"), a home detention supervisor for the Delaware County Community Corrections, also testified at Grider's trial. She said that, a few months prior to the events that occurred in the instant cause, Grider had told her that he had previously been in a shootout and that "if the pigs [came] for [him], they better be prepared for a shootout because [he] [would] kill them." (Tr. Vol. 2 at 168). Davis said that she had asked Grider whether he meant "law enforcement" when he said "pig[s]," and Grider had responded "yea, like I said, pigs." (Tr. Vol. 2 at 168).

[9] At the conclusion of the trial, the jury found Grider guilty as charged. Subsequently, the trial court held a sentencing hearing. At the hearing, the State introduced Grider's pre-sentence investigation report ("PSI"), which revealed that, at twenty-nine years old, Grider had an extensive criminal history. As a juvenile, he had been adjudicated a delinquent for committing offenses that would have been considered Class A misdemeanor battery resulting in bodily injury and Class D felony failure to return to lawful detention if committed by an adult. As an adult, he had been convicted of five misdemeanor and four felony offenses, including two convictions for Class D felony residential entry, one conviction for Class D felony battery resulting in bodily injury, and one conviction for Class D felony dealing in hashish. The felony battery resulting in bodily injury conviction was based on Grider's 2011 attack on a correctional officer while he was incarcerated.

[10] In addition to these convictions, Grider still had three felony and four misdemeanor charges pending in other causes at the time of the sentencing

hearing. He had escaped from a treatment facility while on release for the pending charges, which had resulted in the warrants that had been active for his arrest when he committed the instant offenses.

[11] The PSI also noted that the "cover page" of Grider's Facebook account had the word "Gunemdown" listed in parenthesis.[3] (App. Vol. 3 at 99). The PSI documented that when asked what was meant by "Gunemdown," Grider had "smiled and chuckled" and said that a friend had given him that nickname. (App. Vol. 3 at 99). The probation officer noted that Grider "could not explain . . . what he felt was funny about the nickname or why his friend [had given] him the nickname." (App. Vol. 3 at 99). The State asked him about this nickname during the sentencing hearing, and Grider said that it was a "joke," but he still could not explain why it was a joke. (Tr. Vol. 5 at 129). He said that the nickname came about because he "grew up with rifles and stuff at [his] house when [he] was a kid." (Tr. Vol. 5 at 130).

[12] Grider also testified at the sentencing hearing and told the court that he had mental illnesses and substance abuse issues and would have lasting health effects from the bullet wounds he had received when Deputy Johnson shot him.

---

[3] Pursuant to Indiana Administrative Rule 9(G)(2)(b) and INDIANA CODE § 35-38-1-13, the PSI must be excluded from public access. However, in this case the information contained in the PSI is "essential to the resolution" of Grider's claim on appeal. Ind. Admin. Rule 9(G)(7)(a)(ii)(c). Accordingly, we have included confidential information in this decision only to the extent necessary to resolve the appeal.

[13] At the conclusion of the hearing, the trial court sentenced Grider to forty (40) years executed for each attempted murder conviction, with the sentences to be served consecutively, for an aggregate sentence of eighty (80) years. The trial court gave Grider's mental health and substance abuse issues "no weight" as Grider had received "numerous opportunities" to address those issues and had failed to do so. (Tr. Vol. 5 at 157, 158). The trial court also chose to give Grider's physical injuries "no weight" as he had suffered the injuries by "engaging in the crimes for which he was convicted." (Tr. 158). Grider now appeals.

# Decision

[14] Grider raises two arguments on appeal: (1) there was insufficient evidence to support his convictions; and (2) his sentence was inappropriate. We will address each of these arguments in turn.

## 1. Sufficiency

[15] First, Grider argues that the convictions for attempted murder should be set aside where the evidence was insufficient to establish that he manifested the specific intent to kill Corporal Williams and Deputy Johnson. Our standard of review for sufficiency of the evidence claims is well-settled. We consider only the probative evidence and reasonable inferences supporting the judgment. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or judge witness credibility. *Id*. We will affirm the conviction unless no reasonable fact finder could find the elements of the crime proven beyond a

reasonable doubt. *Id*. The evidence is sufficient if an inference may be reasonably drawn from it to support the judgment. *Id*. at 147.

[16] In order to convict Grider of attempted murder, the State had to prove that he "engage[d] in conduct that constitute[d] a substantial step toward commission of," I.C. § 35-41-5-1, "knowingly or intentionally kill[ing] another human being." I.C. § 35-42-1-1(1). A conviction for attempted murder requires proof of a specific intent to kill. *Henley v. State,* 881 N.E.2d 639, 652 (Ind. 2008). Because intent is a mental state, intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury. *Id.* Firing a gun in the direction of an individual is substantial evidence from which a jury may infer intent to kill. *Id.*

[17] Here, Grider argues that his statement to Davis that he intended to have a shootout with any police that came after him was not sufficient to prove his intent to murder Corporal Williams and Deputy Johnson. However, we need not consider Grider's statement to Davis. At Grider's trial, Corporal Williams was asked whether he was "absolutely positive [Grider] [had been] firing at [him] and [Deputy] Johnson," and Corporal Williams responded "Yes." (Tr. Vol. 3 at 94). Further, although Deputy Johnson did not see Grider's first shot, he saw Grider holding a gun and pointing it in the officers' direction during the second shot. As stated above, firing a gun in the direction of an individual is substantial evidence from which a jury may infer intent to kill. *See Henley*, 881 N.E.2d at 652. Accordingly, we conclude that there was sufficient evidence of Grider's intent to support his convictions for attempted murder.

## 2. Sentencing

[18] Next, Grider argues that his sentence was inappropriate. Under Indiana Appellate Rule 7(B), we may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. The defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). The principal role of a Rule 7(B) review is "to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Id*. at 1224.

[19] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. A Level 1 felony has a sentencing range of twenty (20) to forty (40) years with an advisory sentence of thirty (30) years. As Grider received consecutive forty-year sentences, his aggregate sentence was the maximum he could receive. He argues that such a sentence was inappropriate in light of the nature of his offenses and his character. We disagree.

[20] With respect to the nature of Grider's offenses, we note that Grider was a "fugitive" when he committed the offenses as he had escaped from a treatment facility after he had been granted release in three separate criminal causes so that he could seek treatment. (Tr. Vol. 5 at 138). As a result of his escape, there were three active warrants for his arrest. In order to avoid being arrested, Grider shot at two uniformed police officers acting in the course of their duties. Then, even after Deputy Johnson shot Grider, Grider continued to search on the floor for his gun.

[21] Turning to Grider's character, we note that his attempted murder convictions were not the only evidence of his contempt for law enforcement. In his conversation with his home detention supervisor, he called police officers "pigs" and said he would get in a "shootout with," and kill, any "pigs" who came for him. (Tr. Vol. 2 at 168). He was also convicted in 2011 of Class D felony battery resulting in bodily injury for attacking a correctional officer while he was incarcerated. These actions demonstrate, as the trial court characterized, Grider's "aggressive, hostile, and violent disdain for law enforcement officers and our criminal justice system." (Tr. Vol. 5 at 141).

[22] Grider also has a significant criminal history that includes four felony convictions and three pending felony charges. He has been given opportunities to rehabilitate but has failed to take advantage of those opportunities. Specifically, he was given release in three pending cases so that he could receive treatment, but he absconded from the treatment facility after four days and did

not return to custody.  Similarly, prior attempts at jail, electronic home detention, and supervised probation have not rehabilitated Grider.

[23] In light of the above evidence regarding the nature of Grider's offenses and his character, we do not find his sentence inappropriate.

[24] Affirmed.

Kirsch, J., and Bailey, J., concur.